Filed 9/29/23  P. v. Ceja CA2/8

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE,<br><br>      Plaintiff and Respondent,<br><br>v.<br><br>EDWARD CEJA,<br><br>      Defendant and Appellant. | B314760<br><br>Los Angeles County<br>Super. Ct. No. TA146632 |

APPEAL from a judgment of the Superior Court of Los Angeles County, Allen J. Webster, Jr., Judge.  Affirmed in part, vacated in part, and remanded.

Victor J. Morse, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Steven D. Mathews, Supervising Deputy Attorney General, and Analee J. Brodie, Deputy Attorney General, for Plaintiff and Respondent.

————————————

A jury convicted Edward Ceja and an accomplice of attempted murder and found gang enhancements true. Ceja alone brings this appeal and argues three evidentiary errors compel reversal. He also maintains reversal is necessary due to recent legislation requiring bifurcation of trials involving gang enhancement allegations and adopting heightened proof requirements for these enhancements. We vacate Ceja's gang enhancement finding, remand for further proceedings, and otherwise affirm the judgment. Undesignated statutory references are to the Penal Code.

I

A little after 6 p.m. on June 9th, 2018, Ceja entered a supermarket with two others, Anthony Contreras and Pablo Andy Amador. Surveillance video from inside the store and still shots from the video show Ceja up close. We see his face and his clothing: He is wearing a white shirt with a black one underneath, light blue jeans with black pleats near the knees, a backwards black baseball cap, a black backpack, and black and white shoes. His companions both have white shirts and dark bottoms. From the way Ceja is walking, grabbing his waistband, and readjusting his pants, it appears he has a gun.

The video does not have sound. It shows Ceja chancing upon and then exchanging words with a man named Francisco Rivera, who was accompanied by two others. Ceja squared up with Rivera. Amador pushed Ceja back, and the confrontation ended. Ceja's group left the store without making a purchase and went to Contreras's white Lexus.

The video picks up the passenger side of the car and shows Amador getting inside. The action is further away in the parking lot but is still visible.

2

The video shows the white car pull out of its parking spot and move to a place with a better view of the store's exit. The driver, Contreras, then readjusted the white car's position and waited.

Rivera left the store about five minutes after Ceja, Contreras, and Amador.

As Rivera emerged, the white car sped toward Rivera, who darted out of the way. Ceja jumped out of the back seat with a gun. Ceja shot at Rivera several times, hitting him in the head and arm. Ceja also hit two cars before getting back in the white car, which sped away.

Police arrested Ceja and Contreras. The video captured the Lexus's license plate number, which led police to Contreras. This car was in the driveway of Contreras's home when they served a search warrant there.

In jail, Contreras made incriminating statements to an informant. The two discussed gangs. Contreras said he was in "OES." Mid-conversation, a deputy led Contreras out of the cell and showed him video from the supermarket incident. When Contreras returned, he told the informant, "It's some serious shit, man. . . . I'ma be here for a minute, dog." He described what the video showed. He admitted the video showed his license plate, him, and his "little cousin." Contreras confirmed he didn't "do it" but "they got my little primo . . . on that shit" and "that fool's already on camera . . . ."

Detective Jason Marx had a recording device placed in Contreras's jail cell. A redacted version of the recording was admitted into evidence, but not the transcript. The recording had been sanitized to remove details about a separate homicide involving Ceja, which also was caught on video.

3

Both Ceja and Contreras declined to testify in their joint trial.  Rivera was an uncooperative witness who claimed not to remember the day he was shot.  Rivera previously told Marx that Ceja's group appeared to be looking for trouble, approached him in the store, and "banged" on him:  asked about his gang.  Rivera told them he didn't " 'gang bang.  But if there's a problem, we can handle it.' "

The prosecution played video clips of the supermarket incident for the jury and published still shots from the videos.  Marx, who had been investigating the homicide case involving Ceja and had studied the videos of both shootings, "immediately identified" Ceja as the supermarket shooter.  At trial, he briefly described the circumstances of this other shooting, which occurred in July 2018.  Multiple witnesses had identified Ceja as the shooter there.  Marx's investigation of this other shooting led him to the suspects in this case.

The trial court permitted this testimony under Evidence Code section 1101, subdivision (b), as evidence relating to motive and intent.  The court did not, however, allow the prosecution to play the surveillance video of the other shooting.  The prosecution had charged Ceja for the June 2018 supermarket incident and the July 2018 homicide in one information.  But on defense motions, the court severed the counts for the two incidents for trial.

Other evidence tied Ceja to the supermarket shooting.

The prosecution introduced text messages from Ceja to his girlfriend in which he appears to discuss the shooting.  The messages appear to say:  Some shit, babe they got me "smh" (shaking my head); I told him take it outside cuz security was on us already so we waited outside in a parking lot; so we pulled up

4

and I just did my thing; my mom called me to see if it was me and she said the whole parking lot was taped off and they took his bitch ass to the hospital; I'm sorry baby but I ain't gonna look like no bitch.

Several hours before the shooting, Ceja recorded a selfie video of him wearing the same clothing and backpack shown in the supermarket surveillance videos. In the video, Ceja makes a gang hand sign and pulls out a Beretta 92F handgun—a nine-millimeter gun—from his waistband. Other photographs and video from Ceja's cell phone show him with what looks like this gun and clothing matching the supermarket shooter's. Marx established the gun shown in Ceja's phone was consistent with the gun seen in the surveillance videos for both shootings. Police never found the gun.

The jury learned that Ceja and Contreras had texted about Contreras providing Ceja a nine-millimeter handgun, and that police found nine-millimeter expended bullet casings at the supermarket crime scene.

Marx established the light jeans worn by the supermarket shooter matched those worn by Ceja in the July shooting and those shown in photographs and videos on Ceja's phone. Police found these jeans at Ceja's address with an empty Beretta magazine in the pocket. Police also found a black baseball cap there.

An expert tied Ceja to DNA found on the recovered jeans. Another expert determined the cartridge casings found at the supermarket crime scene would fit into the recovered magazine, and the magazine would fit into a nine-millimeter Beretta.

Cell phone and social media evidence established Ceja, Contreras, and Amador were cohorts. The jury saw these three

5

and others posing with guns or making the hand sign for the OTF gang (Only the Family). Videos from Contreras's phone show him tagging OTF and OES.

Detective Carolina Roman was the prosecution's gang expert. She explained committing crimes benefits gangs by instilling fear in the community, enhancing the gang's reputation for violence, making the gang more powerful, and increasing respect from other gangs. She provided background on OTF—including its primary activities and rivalries, and its association with OES—and she opined Ceja was a member of OTF. Roman opined the shooting was committed for a gang's benefit.

The lead security officer for Lynwood schools reluctantly testified about OTF and other cliques or "tagging crews" at the high school and the problems they caused on campus. He identified Amador and others as part of OTF and testified Ceja would get into altercations at school.

The prosecution's trial theory was that Ceja and family members belonged to a small and ambitious gang, eager to establish itself and to move up the ranks among gangs. Their gang sought to win recognition from the Mexican Mafia, which would give OTF status in the neighborhood. Recognition from the Mexican Mafia is significant, because "the Mafia is like the ultimate for gangs. So it's very important for them to get it." A way for a lesser gang to earn Mexican Mafia recognition is to establish a reputation for violence. "So they're going to commit crimes, shootings, murders, they're going to show how violent they are in order to be recognized by them."

One prosecutorial theme was that Ceja was acting to establish a reputation as a shooter—a true killer. "A reputation is everything." Some of the prosecution's case concerned Ceja's

6

boastful social media postings about what a fearful threat he was. One message was that "he would shoot somebody in the head." "They better be afraid of him."

For the defense, Ceja's counsel recalled Marx and called a video witness who compared photographs from Ceja's phone to still shots from the supermarket videos and discussed clips from these videos. This presentation aimed to establish the shooter was not wearing a hat and backpack, the video did not show anyone get into the white Lexus, and all three suspects wore white shirts.

Contreras's counsel did not call witnesses. He and the prosecution stipulated Contreras was not related to Ceja and others by blood. Contreras's case was built on conceding he was the driver and Ceja was the shooter but portraying himself as an unknowing companion.

The jury convicted Ceja and Contreras of willful, deliberate, and premeditated attempted murder. (§§ 664, 187, subd. (a).) It found firearm and gang allegations true. (§§12022.53, subds. (a)-(d) & (e)(1), 186.22, subd. (b)(1)(C).) The jury also convicted both defendants of felony and misdemeanor vandalism for the damage to the two cars. (§ 594, subd. (a).) Ceja separately pleaded no contest to murder for the July 2018 incident.

II

On appeal, Ceja maintains the trial court should have excluded evidence of the July shooting, Contreras's jailhouse statements, and all cell phone evidence. Ceja also contends he should benefit from recently enacted ameliorative laws for gang enhancements, laws he says require reversal here. We agree only with part of his latter contention. A limited remand is necessary.

7

## A

Ceja first argues it was improper to admit evidence of the July shooting because this incident was dissimilar to the June supermarket shooting and the evidence was unduly prejudicial. For purposes of analysis, we assume there was error. This assumed error was harmless. We apply the harmless error standard of *People v. Watson* (1956) 46 Cal.2d 818 (*Watson*). (See *People v. Jefferson* (2015) 238 Cal.App.4th 494, 508.)

The jury watched a video of Ceja shooting Rivera. It could compare Ceja's face, clothing, and demeanor from the video clips and the still shots to the pictures and video from Ceja's phone showing him with a Beretta 92F handgun. One selfie video from a few hours before the shooting shows Ceja holding this gun and wearing the same clothes the supermarket videos show. The jury could see that of the three men who approached Rivera's group in the store, only Ceja could have been the shooter, as only he was wearing light pants.

Marx tied the distinctive jeans Ceja wore in the supermarket video to those shown in Ceja's phone and found at Ceja's address with an empty Beretta magazine in the pocket. He linked the recovered magazine to the crime weapon. And he connected the gun featured in Ceja's phone to the gun seen in the store shooting.

The jury saw the jeans, the black baseball cap, and the magazine found at Ceja's address. DNA on the jeans pointed to Ceja.

The jury knew Ceja and Contreras had texted about Contreras giving Ceja a nine-millimeter gun. And it knew police found nine-millimeter expended bullet casings at the scene.

The jury saw text messages in which Ceja appeared to confess to the crime and to identify his motive.

In short, this assumed evidentiary error in admitting evidence of another crime was harmless.

B

Ceja argues the trial court improperly admitted Contreras's recorded jailhouse statements under the hearsay exceptions for declarations against interest and party admissions. Ceja does not challenge their admission on confrontation grounds.

Ceja and Contreras had a joint trial. The trial court admitted the jailhouse recording with some redactions, but not the transcript.

Any assumed error was harmless. Even if the trial court incorrectly admitted this evidence, reversal of Ceja's convictions would be unwarranted. We again apply the *Watson* harmless error standard. (See *People v. Duarte* (2000) 24 Cal.4th 603, 618–619 (*Duarte*).)

The jury did not ask to listen to the recording while deliberating, and it had no transcript to study during its deliberations. The recording was almost an hour long. Much of the time, the informant was providing information, advice, and assurances to Contreras. Contreras expressed concern about his situation, at times saying he was "trippin' out" and didn't "know what the fuck to say" to police.

Contreras spoke about his gang involvement and conceded his "little cousin" was "active" and was putting them on the map. He noted his male family members—including his brother, five "primos" (cousins), and an uncle—are all "busted" for serious crimes. He acknowledged: "I guess when it's time to put in work,

9

fool, it's just time to put in work" and "this is the life we chose . . . . It is what it is, dog."

At times, Contreras spoke about the supermarket shooting: he explained how the situation went from "zero to a hundred real quick" despite his efforts to de-escalate it; how he drove away afterwards and covered his tracks by wiping down the car and breaking his phone; and how "they're gonna get me for that shit, dog." Only after Contreras left the jail cell to watch the surveillance video and returned did he concede that his "primo" did it: he "just hopped out the car and started letting that fool have it, dog." When asked if you can see it "good" on the video, Contreras responded: "Very good, fool. I'm there too, fool. Fuck, man. It is what it is, dog."

We also incorporate our earlier analysis of harmless error.

The prosecution's case against Ceja was strong without Contreras's statements. It is not reasonably probable Ceja would have obtained a more favorable result had the court excluded the disputed statements. (See *Duarte, supra*, 24 Cal.4th at pp. 613, 619–620 [applying the *Watson* standard where exculpatory statements were erroneously admitted].)

Ceja argues a more stringent standard of harmlessness applies because the challenged evidence was unreliable. Ceja's cases rebuff this argument. (E.g., *Duarte, supra*, 24 Cal.4th at pp. 618–619 ["Because the prosecution's case depended so heavily on the unreliable and impeached testimony of Eran Knox . . . we also conclude that the court's error in applying section 1230 cannot be dismissed as harmless under *People v. Watson* [ ], the standard applicable to state law error in the admission of hearsay"]; *People v. Gallardo*, 18 Cal.App.5th 51, 74, 76–77 [applying the *Watson* standard after finding the disputed

10

statements were too self-serving and unreliable to qualify as declarations against interest].)

The circumstances of Contreras's jailhouse statements also bear hallmarks of reliability. From the long exchange between Contreras and the informant, it was apparent Contreras made his statements in confidence to someone he trusted: apparently an older, experienced fellow gang member and cellmate. There is no sign Contreras suspected he was speaking to a police informant. Much of what Contreras relayed disserved his penal interest: his statements made him at least an accessory to the supermarket shooting and implicated him in gang activity. Most of Contreras's statements did not concern his younger "primo." While Contreras hoped his "cousin" would take the blame, he told the informant "I ain't gonna say shit though" because "that's my primo." According to Contreras, when police identified Ceja, he told them he didn't know what they were talking about. Contreras was not looking to improve his situation with the police by shifting responsibility to Ceja.

Contreras's statements were not so unreliable that their admission violated Ceja's constitutional rights.

C

Ceja's third contention is the trial court erroneously admitted cell phone evidence without sufficient authentication. He appears to claim evidence purportedly from his and Contreras's phones could be authenticated only by the person who extracted data from the phones.

We assume Ceja did not forfeit this third contention. Nevertheless, this contention is incorrect.

Authentication means introducing evidence sufficient for a fact finder to find the evidence is what it purports to be. (Evid.

11

Code, § 1400; *People v. Goldsmith* (2014) 59 Cal.4th 258, 267 (*Goldsmith*).) The proponent may rely on expert testimony, the writing's content, or circumstantial evidence. (Evid. Code, §§ 1418, 1421; *Goldsmith*, at p. 268.) "[T]here are no limits on the means by which a writing may be authenticated." (*People v. Cruz* (2020) 46 Cal.App.5th 715, 729; see Evid. Code, § 1410.)

We review a trial court's decision that evidence has been sufficiently authenticated for abuse of discretion. (See *Goldsmith*, *supra*, 59 Cal.4th at p. 266.)

The disputed items are photographs and videos stored on the phones Marx obtained from Ceja and Contreras's home pursuant to search warrants, and "Cellebrite" reports reflecting text messages on these phones. Cellebrite is the extraction software.

Marx's testimony, plus the content and timing of the items, was sufficient to show the disputed items were what the prosecution claimed they were: photographs and videos from the defendants' phones and messages created by them. (See *Goldsmith*, *supra*, 59 Cal.4th at p. 271 [content of photographs may support a finding of genuineness]; see also *People v. Valdez* (2011) 201 Cal.App.4th 1429, 1437 (*Valdez*) ["the proponent's threshold authentication burden for admissibility is *not* to establish validity" categorically].)

Marx was present for Ceja's arrest. Ceja had a cell phone on him at the time, which was booked. Marx obtained Contreras's phone after serving a search warrant on Contreras's residence. He wrote the search warrants to obtain the data from both phones.

Once he gets these warrants, Marx transfers the phones to the Sheriff Department's High-Tech Task Force. The task force

12

then uses Cellebrite software to download the data in a way that leaves no footprint and does not alter the data.

Marx provided "the complete download" to the parties. Looking at one of the Cellebrite reports, he explained this was the format of the text messages extracted from the phone. Cellebrite trained and certified Marx and the task force to do this work. Marx formerly had been in charge of the downloading. He explained how the software allowed investigators to generate separate reports to "parse out different parts of information such as contacts, text messages, photographs." That is what he did in this case.

Marx testified he went through Ceja's phone to look for pictures, photographs, and videos from the date of the shooting, and he accessed messages and photographs from both defendants' phones pursuant to search warrants. He then testified about various photographs, videos, messages, and extraction reports from the phones.

The photographs and videos have identifying features: one still shot of a video created the day of the July homicide shows the distinctive light blue jeans and a Beretta 92F handgun; the selfie video made the day of the supermarket shooting shows Ceja wearing the same clothing he wears in the surveillance video, holding a Beretta, and making the OTF gang hand sign; several photographs show Ceja, Amador, and sometimes others either making this hand sign or holding a gun; another photograph shows Ceja's gang moniker ("Baco") with "O.T.F." tagged on a wall; other videos show Contreras doing the tagging himself.

The reports also have identifying features: they include known contacts or monikers, including "Nutty" (Contreras), "50" (Amador), and Ceja's girlfriend Genesis. Some show Ceja's

distinctive writing style and labeling, as explained by Marx and Roman.

The key text messages between Ceja and his girlfriend are close in time to the supermarket shooting. They appear to refer to the shooting. They name Ceja as one of the people texting: Ceja's girlfriend calls him "Edward."

No witness or evidence created doubt that the phone evidence was anything but authentic photographs, videos, and messages from the defendants' phones. No defendant denied a phone was his or claimed Cellebrite provides false data or inaccurate reports.

To authenticate the data, the prosecution did not need to call the person who performed the downloads. (See *People v. Calhoun* (2019) 38 Cal.App.5th 275, 290–293, 314 & 319 [phone data properly authenticated where the officer who seized a Vortex cell phone and was familiar with Cellebrite—but who had others do the download—testified, and where the contacts and messages reflected in the report established the victim used the phone to communicate with the defendant]; see also *Goldsmith*, *supra*, 59 Cal.4th at p. 272 ["We disagree that the testimony of a Redflex technician or other witness with special expertise in the operation and maintenance of the ATES [automated traffic enforcement system] computers was required as a prerequisite for authentication of the ATES evidence"].)

*In re K.B.* (2015) 238 Cal.App.4th 989 is consistent with our analysis. The prosecution in *In re K.B.* relied on the testimony of a police officer who used Cellebrite to extract images on the defendant's phone, but the court did not say this foundation was required. (See *id.* at pp. 997–998.)

This trial court did not abuse its discretion in admitting the disputed phone evidence. (See *Valdez, supra,* 201 Cal.App.4th at p. 1436 ["the trial court could conclude that particular items on the [MySpace] page, including a photograph of [defendant] forming a gang signal with his right hand, met the threshold required for the jury to determine their authenticity"].)

D

Ceja's fourth and fifth contentions spring from Assembly Bill No. 333 (2021–2022 Reg. Sess.) (AB 333), which became effective on January 1, 2022, after the jury convicted Ceja. (See *People v. Tran* (2022) 13 Cal.5th 1169, 1206 (*Tran*).)

AB 333 did two key things. First, it added section 1109, which, on defense request, requires gang enhancement allegations be tried separately from the substantive offense. (*Tran, supra,* 13 Cal.5th at p. 1206.) Second, it altered the elements of the section 186.22 gang enhancement. (See *ibid.*)

Ceja argues the first change requires reversal of the entire judgment and the second requires reversal of his gang enhancement. We reject the first argument and accept the second.

1

California appellate courts are split on whether the new bifurcation provision applies retroactively. (*Tran, supra,* 13 Cal.5th at p. 1208.) Our Supreme Court acknowledged the split but declined to resolve it in *Tran.* (*Ibid.*)

We need not take sides because we conclude the lack of bifurcation did not prejudice Ceja.

"The People are generally entitled to introduce evidence of a defendant's gang affiliation and activity if it is relevant to the charged offense." (*People v. Chhoun* (2021) 11 Cal.5th 1, 31

15

(*Chhoun*); see also *Tran, supra,* 13 Cal.5th at p. 1208 [even if not admitted to prove a gang enhancement, gang evidence may be relevant and admissible to prove other facts related to a crime].)

While not all the gang evidence introduced in this case would have been admissible in a bifurcated trial, most of it was relevant and would have been admissible to establish Ceja's motive and intent for the attempted murder charge. "Evidence of the defendant's gang affiliation—including evidence of the gang's territory, membership, signs, symbols, beliefs and practices, criminal enterprises, rivalries, and the like—can help prove identity, motive, modus operandi, specific intent, means of applying force or fear, or other issues pertinent to guilt of the charged crime." (*People v. Hernandez* (2004) 33 Cal.4th 1040, 1049.)

Ceja's appellate briefing concedes the gang evidence could support an inference he had a motive to commit the attempted murder and "*some* gang evidence would certainly have been admissible to prove appellant's association with his codefendant Contreras and his motive to commit the charged attempted murder."

Gang evidence would have remained central to this case because it explained why Ceja responded violently and disproportionately to a small provocation. Evidence of Ceja's and other participants' gang affiliation provided context for Ceja's actions and helped establish his motive and intent. (See *Chhoun, supra,* 11 Cal.5th at p. 30–33 [finding gang evidence relevant and admissible and recognizing "motive can illuminate intent"].) The probative value of the evidence also outweighed its potential for unfair prejudice.

16

Evidence that two OTF members committed other offenses—underage possession of a firearm, vandalism, and aggravated assault—would have been unnecessary in a trial limited to the charged offenses.  This evidence, however, comprised only a few pages of trial testimony and a handful of exhibits.  The charged attempted murder was more inflammatory and more serious.  This other evidence did not prejudice Ceja.  Nor did it render this trial fundamentally unfair.

Given the strength of the evidence against Ceja, as we have recounted above, and the relevance of gang evidence to Ceja's attempted murder charge, there was no reasonable probability Ceja would have obtained a more favorable result if his trial had been bifurcated.  (See *Tran*, *supra*, 13 Cal.5th at pp. 1209–1210 [applying *Watson*]; see also *People v. Ramos* (2022) 77 Cal.App.5th 1116, 1131 [same].)  New section 1109 does not require reversal of Ceja's guilty verdicts.

2

Apart from adding section 1109, AB 333 amended section 186.22 in many respects and made the standards for applying gang enhancements more rigorous.  (*People v. Cooper* (2023) 14 Cal.5th 735, 744–745 (*Cooper*); see also *Tran*, *supra*, 13 Cal.5th at p. 1206 [outlining the changes].)  Among other things, this bill narrowed the definition of "pattern of criminal gang activity" by specifying the predicate offenses must commonly benefit a criminal street gang and by requiring the benefit to be more than reputational.  (*Tran*, at p. 1206; § 186.22, subds. (e)(1) & (g).)

The parties agree these statutory changes apply retroactively to Ceja but dispute whether a remand to retry the enhancement is warranted.  Ceja prevails on this issue.

17

*Chapman v. California* (1967) 386 U.S. 18 governs our review. (*Cooper, supra*, 14 Cal.5th at p. 746.)

This trial did not establish the new statutory requirements of section 186.22. Ceja argues many requirements were not met, but noting one example suffices here: the evidence did not establish the predicate offenses introduced at trial benefited a gang in a way that was more than reputational. (See § 186.22, subds. (e)(1) & (g).)

The record is rather thin on the predicate offenses. The prosecution established Philip Smith was an OTF member who admitted to firearm possession by a minor and was photographed holding the firearm. The prosecution also established Ricky Gomez was an OTF member who pleaded no contest to a violation of section 245, subdivision (a)(4), and also had a vandalism case for spray painting "OTF" on a bank. No evidence addressed the circumstances of the assault apart from the following: Roman testified she learned that Gomez approached a victim, demanded money, stabbed the victim, and remarked, " 'This is my turf.' "

Roman repeatedly stressed the importance of reputation and testified gang members commit crimes for their gangs to enhance their reputation.

A jury reasonably could have concluded from the evidence that the predicate offenses were committed for personal gain or to enhance OTF's reputation. This is insufficient under the amended statute. (See *Cooper, supra*, 14 Cal.5th at p. 744.)

To compound this problem of proof, the trial court instructed the jury, consistent with the old law, that the predicate offenses did not have to be gang related. (See *Cooper, supra*, 14 Cal.5th at p. 740.)

18

Ceja's gang enhancement finding cannot stand.  (See *Cooper*, *supra*, 14 Cal.5th at pp. 746–747; *People v. Ramirez* (2022) 79 Cal.App.5th 48, 64, review granted October 12, 2022, S275341.)

## DISPOSITION

We vacate Ceja's gang enhancement finding and remand the matter to the trial court to provide the prosecution an opportunity to retry the gang allegations against Ceja under the amended section 186.22.  In all other respects, we affirm the judgment.


WILEY, J.


We concur:



STRATTON, P. J.



GRIMES, J.

19